UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

EDMOND MENARD,

                    **Plaintiff,**

-vs-                                     **Case No. 6:05-cv-1145-Orl-31DAB**

**HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,**

                    **Defendant.**

_____

# ORDER

Plaintiff brings this action for wrongful denial of long-term disability benefits under

29 U.S.C. § 1001, *et seq.,* the Employee Retirement Income Security Act ("ERISA"). This matter

comes before the Court on a Motion for Summary Judgment, filed by Defendant Hartford Life and

Accident Insurance Company ("Hartford") (Doc. 30), and Plaintiff's Response thereto (Doc. 33).

**I. Background**

    *A) The Facts*

Plaintiff, Edmond Menard ("Menard"), as an employee of BAE Systems North America

("BAE"), was a participant in an employee welfare benefit plan (the "Plan") funded by a group

insurance policy (the "Policy") issued by Hartford. In 2001, Menard sustained a lower back injury

while swinging a golf club. He underwent several surgical and post-surgical procedures in 2002

and 2003. (Administrative Record p. H-219).[1]  Unfortunately, Menard continued to experience

significant pain and limited mobility due to his injury.

Menard stopped working in August 2003 and subsequently applied for Long Term

Disability ("LTD") benefits. His application was approved and Hartford began paying benefits

effective February 23, 2004. (A.R. H-162, 274-276, 341).  At this time, Menard was taking up to

16 Percocet[2] tablets per day to manage his pain. (A.R. H-168).  On March 22, 2004, Menard's

treating physician, John Diorio, M.D. ("Dr. Diorio"), advised Hartford by telephone that Menard

was unable to perform sedentary work. (A.R. H-120, 174).

In November 2004, Hartford requested updated information regarding Menard's condition.

Hartford sent Menard a Claimant Questionnaire for him to complete and return, and an Attending

Physician Statement to be completed and returned by his treating physician. (A.R. H-252). Menard

returned both forms the following month, advising Hartford that he did not have a treating

physician at that time. (A.R. H-247).

Hartford then arranged for an Independent Medical Examination ("IME") in order to

determine Menard's level of functionality. (A.R. H-144, 226, 237).  The IME was performed on

---

[1]The exhibits in this case are filed in the form of an Administrative Record, with pages numbered as: H-__.  Therefore the Court will cite to the record as (A.R. H-__).

[2]"This medication is a combination of a narcotic (oxycodone) and a non-narcotic (acetaminophen) used to relieve moderate to severe pain. Oxycodone works by binding to opioid receptors in the brain and spinal cord, and acetaminophen decreases the formation of prostaglandins, therefore relieving pain." *WebMD*, http://www.webmd.com/drugs/drug-7277-Percocet.aspx?drugid=7277&drugname =Percocet (last visited Oct. 26, 2006).

February 18, 2005, by Edwin M. Villalobos, M.D. ("Dr. Villalobos").  At this time, Menard was

taking Elavil[3] and Zanaflex[4], but stated he had run out of Percocet. (A.R. H-169).  After

performing a physical examination of Menard, Dr. Villalobos reported that Menard "can handle at

least a sedentary, light-duty capacity, consisting of frequent lifting of 5-10 pounds, occasional

lifting of 15-20 pounds, alternating sitting and standing, [with] no restrictions with the use of his

hands and feet, and occasional above-the-head activities." (A.R. H-220).

Hartford requested clarification from Dr. Villalobos on the following question: "Would

Mr. Menard be able to perform an occupation that is predominantly sedentary described as sitting

approximately 6 hours/day if able to stand and stretch at will or as needed?" (A.R. H-105). On

April 6, 2005, Dr. Villalobos provided an addendum to his previous IME report. The addendum

included the following description of Menard's condition and capabilities:

> Mr. Menard is a patient I initially saw on 2/18/05 for evaluation and treatment of his
> chronic neck and low back pain. At that time, he was diagnosed having:
>     1. CHRONIC LOW BACK PAIN SYNDROME.
>     2. HISTORY OF LUMBAR FUSION WITH SPINAL
>     INSTRUMENTATION.
>     3. STATUS POST REMOVAL OF HARDWARE.

---

[3]Elavil is an anti-depressant with side effects such as dizziness and drowsiness. *See WebMD,*
http://www.webmd.com/search/search_results/default.aspx?query=elavil&sourceType=all (last visited
Oct. 26, 2006).

[4]"This medication is used to treat muscle tightness and cramping (spasm) caused by conditions
such as multiple sclerosis or spinal injury. Decreasing spasms can reduce pain and improve your
ability to move around." Depression, fatigue and dizziness are listed as side effects.  *WebMD,*
http://www.webmd.com/drugs/drug-14706-Zanaflex.aspx?drugid=14706&drugname=Zanaflex (last
visited Oct. 26, 2006).

> I feel that he can handle at least a sedentary occupation, sitting approximately 6 hours daily, with frequent lifting of 5-10 pounds, occasional lifting of 15-20 pounds, no restrictions with the use of his hands and feet, and occasional above-the-head activities.

(A.R. H-209).

On April 13, 2005, Hartford Life notified Menard of its determination that he was ineligible for continued LTD benefits because: (a) Dr. Villalobos had found him capable of working in a sedentary occupation; and (b) Menard's occupation as a Senior Subcontract Administrator was "classified as a sedentary occupation in the general workplace." (A.R. H-144). Menard's benefits were discontinued effective April 30, 2005. (A.R. H-144).

Exercising his procedural rights under the Policy, Menard appealed the decision to discontinue benefits. In connection with his appeal, he submitted a treatment note from John Ortolani, M.D. ("Dr. Ortolani"), reflecting that Dr. Ortolani examined and treated Menard on May 16, 2005. (A.R. H-201, 204-206). Dr. Ortolani concluded the treatment note with the following diagnosis and assessment:

> Bilateral lumbar radiculopathy, severe, with pain radiating down both legs. The patient can only limp heavily with a cane. He cannot sit up for long periods of time. He can walk only one block at a time. He spends most of his day lying down in bed…. Overall I feel this patient is severely affected and certainly cannot work in his current condition. Having two surgeries on his back, it is likely that he also has some scar tissue in this area. I feel this condition is permanent and that he is permanently disabled from any type of gainful employment.

(A.R. H-206).  Hartford then sent Menard's medical records for an independent records review by the University Disability Consortium ("UDC"), an independent group of physicians specializing in disability evaluation. The UDC review was performed by Greg Lipschutz, M.D. ("Dr. Lipshutz"), a consulting neurologist. After reviewing Menard's medical records, Dr. Lipschutz furnished Hartford with a written report setting out his medical findings and opinions. (A.R. H-162-72, 191-

92).  Even though Dr. Lipschutz had never seen Menard, he opined that Menard was capable of

going back to work in a sedentary occupation. (A.R. H-172).  Dr. Lipschutz appears to criticize Dr.

Ortolani and Dr. Diorio for relying on Menard's "subjective reports" of pain. (A.R. H-172). Dr.

Lipshutz also characterizes Dr. Villalobos' assessment as "confusing." (A.R. H-172).  Hartford

maintained its position that Menard was no longer disabled and refused to reinstate his benefits.

*B) The Plan*

The Policy gave Hartford Life "full discretion and authority to determine eligibility for

benefits and to construe and interpret all terms and provisions." (A.R. H-29).  Under the Policy,

LTD benefits were payable to a covered employee who became disabled, as defined in the Policy,

and remained so through and beyond the applicable elimination period. (A.R. H-18).

The Policy contained the following applicable definition of "Disabled":

> **Disability or Disabled** means that during the Elimination Period and for the next 24
> months you are prevented by:
>> 1. accidental bodily injury;
>> 2. sickness;
>> 3. Mental Illness;
>> 4. Substance Abuse; or
>> 5. pregnancy,
> from performing one or more of the Essential Duties of Your Occupation….
> After that, you must be so prevented from performing one or more of the essential duties of
> Any Occupation.

(A.R. H-72) (bold type in original).[5]

The Policy contained the following definition of "Your Occupation":

------

[5]This action concerns only LTD benefits payable for the first 24 months of Menard's disability,
therefore the "Your Occupation" standard is applicable, rather than "any occupation."

>**Your Occupation** … means your occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job you are performing for a specific employer or at a specific location.

(A.R. H-32) (bold type in original).

The Policy defined an "Essential Duty" as follows:

>**Essential Duty** means a duty that:
>1. is substantial, not incidental;
>2. is fundamental or inherent to the occupation; and
>3. can not be reasonably omitted or changed.
>To be at work for the number of hours in your regularly scheduled workweek is also an Essential Duty.

(A.R. H-29) (bold type in original).

Eligibility for LTD benefits was conditioned on the employee providing Hartford with satisfactory proof that he or she was disabled. The Policy provided that payment of LTD benefits would cease when a claimant was no longer disabled or failed to furnish satisfactory proof of continuing disability. (A.R. H-19, 27).

Menard was employed by BAE as a Senior Subcontract Administrator. (Doc. 1 at 2). According to BAE's written job description, a Senior Subcontract Administrator was responsible for "administrative and operational management of high value, extremely complex and/or critical subcontracts." (A.R. H-283). The same job description set out the duties of a Senior Subcontract Administrator as follows: (a) manage the administration of high value, complex and/or critical subcontract procurements in a manner to insure that all prerequisites of cost, quality, technical performance and schedule are achieved; (b) prepare or insure the preparation by others of all subcontract documents, statement of work specifications, terms and conditions in accordance with applicable requirements; (c) perform the subcontract award process including selection of

appropriate suppliers, solicitation of proposals, analysis and evaluation of subcontract bids,

chairing of source selection committee, negotiation and execution; (d) manage the change order

process for all existing subcontracts; (e) insure that all subcontract actions and documentation are

in strict compliance with company policies and procedures, as well as federal laws and regulations;

(f) insure that the company's contractual interests are protected at all times; (g) serve as

operational interface between the Subcontracts department and other company departments; (h)

investigate and evaluate new sources of supply, products, processes, and/or materials; (I) evaluates

established systems, policies and procedures, and recommends changes to improve productivity;

and (j) supervise drafting of subcontract documents. (A.R. H-283-284).  Plaintiff states that his

occupation also requires a significant amount of travel in order to interact with clients at the Point

of Service ("POS") as indicated in the job description provided by Menard's supervisor. (Doc. 33

at 13; A.R. H-314).

**II. Standard of Review**

Although the parties have styled their motions in the posture of summary judgment, given

the nature of challenges to benefit determinations under ERISA, Hartford's motion is more

properly construed as a motion for final judgment. *Providence v. Hartford Life & Accident Ins.*

*Co.*, 357 F. Supp. 2d 1341, 1342 n.1 (M.D. Fla. 2005). In this sort of case, the Court sits in more

of an appellate capacity than as a trial court, and the Court's task is to review the benefit decision

based on the administrative record available to the decision maker at the time of the decision. *Id*.

Thus, the usual standard for summary judgment, such as whether genuine issues of material fact

exist, does not apply. *Id*.

Under 29 U.S.C. § 1132(a)(1)(B), a person may bring a civil action to recover benefits due under a plan, or to enforce rights under the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 108 (1989). The ERISA statute does not, however, provide a standard of review for actions challenging benefit eligibility determinations. *Firestone,* 489 U.S. at 109. In response to the complex and often confusing body of law that has developed regarding the standard of review to be applied in these cases, the Eleventh Circuit created a five-step approach

for use in judicially reviewing virtually *all* ERISA-plan benefit denials:
(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
(2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
(3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
(5) If there is no conflict, then end the inquiry and affirm the decision.
(6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Williams v. Bellsouth Telecommunications, Inc.,* 373 F.3d 1132, 1137-38 (11th Cir. 2004)

(emphasis in original).[6]

--------

[6]While the step-by-step approach detailed in *Williams* may be theoretically helpful, it appears to be somewhat out of order. The Court is instructed to begin by deciding if the administrator's decision was "*de novo* wrong." However, *de novo* review is the most searching standard of review available, in which the Court gives the plan administrator's decision no deference whatsoever. Then, once the Court has examined all the evidence and determined that the plan administrator was wrong, *Williams* instructs the court to conduct a few simple inquiries to determine whether to defer to that apparently "wrong" decision and apply an arbitrary capricious standard of review. It appears to make more sense, in the pursuit of judicial economy, to avoid the fact-intensive *de novo* review whenever possible. However, this Court is bound by *Williams*, and will address the issues in the order

### III. Legal Analysis

*A) Was Hartford's decision wrong?*

In determining whether Hartford's decision was wrong under a de novo standard of review, the Court will give no deference to Hartford's decision. *Williams,* 373 F.3d at 1137.   Furthermore, the Court may review evidence not contained in the administrative record. *Muzkya v. Unum Life Ins. Co. of America,* 2005 U.S. Dist. LEXIS 23401, *11 (M.D. Fla. July 7, 2005), *aff'd* 2006 U.S. App. LEXIS 23452 (11th Cir. Sept. 13, 2006).  For example, a determination of disability by the Social Security Administration ("SSA") may be considered in reviewing a plan administrator's determination of benefits, although it is not dispositive. *Paramore v. Delta Airlines, Inc.*, 129 F.3d 1446, 1452 n.4 (11th Cir. 1997); *Kirwan v. Marriott Corp.*, 10 F.3d 784, 790 n.32 (11th Cir. 1994). At this stage, the court is essentially acting as a fact-finder, reviewing the evidence and making a determination on its own as to whether the Plaintiff is entitled to disability benefits.

Looking at all the evidence in the record, this Court has determined that Hartford's decision was wrong.  The evidence establishes that Menard has been suffering from back pain due to a spinal injury for many years.  Doctors have continuously prescribed him medications and therapy to assist him in dealing with his injury.  Prior to the IME ordered by Hartford, there is no indication that Menard's condition was significantly improving in any way.  Even if Menard is capable of sitting for 6 hours, that does not mean he is capable of performing his full-time job. Menard is still taking a number of different medications to manage his pain and depression, and some of these medications may have an effect on his cognitive abilities.  None of the doctors

prescribed by the Eleventh Circuit.

chosen by Hartford to evaluate this case gave any opinion as to whether Menard could truly function at work.

Menard was only required to show that he was unable to perform one of the essential duties of his position, which included being at work for the number of hours per week required.  The doctors chosen by Hartford did not offer any opinion as to whether Menard could work 40 hours/week.  Simply being able to sit for 6 hours/day is not enough to perform a full-time job. Menard's own account of his condition, his medical history, and the evaluation by his doctor in May 2005, all create a serious question as to whether Menard is actually capable of performing all of the essential duties of his job.  Because Menard need only demonstrate that he is incapable of performing *one* of the essential duties of his occupation, it is enough that the evidence presented by Menard indicates that he is not well enough to work a full work week – and none of Hartford's evidence contradicts that.

Furthermore, despite Hartford's claim that Menard's possible depression, drug addiction and/or alcoholism are irrelevant because his LTD claim was based solely on his back injury, the Court finds no evidence of this in the record.  There is no evidence that Menard ever asserted that his sole disability was his back injury.  Nor is there any evidence that such an averrrment was required or implied by the terms of the Plan.  In fact, the Attending Physician's Statement stamped Jan. 29, 2004 (prior to the initial approval for LTD benefits) indicates that Menard is claiming disability for injury *and* illness, and depression is specifically mentioned on the form. (A.R. H-341-42).  Even if depression had not been mentioned initially, it seems illogical that a person would lose their benefits if the disability that caused them to stop working in the first place resulted in a second disability down the line.  In this case, it appears that Menard's back injury

required  him to take pain medications on which he became dependent. It also appears that the depression mentioned in his medical records can be associated with the injury.  Hartford asserts several times in the record that its decision to discontinue benefits was based on a review of the record as a whole.  Any such review indicates that Menard is suffering from multiple ailments: back injury, depression, and substance abuse.  All three of these conditions qualify as disabilities under the Plan if they prevent him from performing "one or more of the Essential Duties" of his occupation.  Whether Menard is taking 12 Percocet/day because of pain or because of an addiction is irrelevant to the ultimate determination of whether he is disabled.  Such a significant dose of a narcotic could certainly have an effect on his ability to do his job – especially for 40 hours/week.

It appears that Hartford's decision relies solely on the opinion of the two Doctors it chose to review Menard's case.  However, looking at the record as a whole, the Court finds that those two opinions are not persuasive.  Menard's original injury is real and well established through objective medical evidence.  At this point, the major question is whether he continues to experience substantial pain that prohibits him from working in his occupation.  The record indicates that Menard stays in bed most of the day, still requires significant doses of pain medication, and relies on a cane walking.  Dr. Villalobos offers no explanation for the fact that he appears to totally discredit Menard's complaints.  He simply states that even though Menard has suffered past injury, he is now able to work. (A.R. H-209).  Dr. Ortolani, reviewing the same patient and the same medical history comes to the opposite conclusion.  Again, it appears that the only difference is that Dr. Ortolani believed Menard and Dr. Villalobos did not.  The Court finds the report by Dr. Lipshutz unpersuasive.  Dr. Lipshutz never met or examined Menard.  Instead, he simply looked at Menard's records and interpreted what other Doctors had written down in the

past.  Looking at the records that Dr. Lipshutz reviewed, this Court cannot see why he too rejected

Menard's complaints and simply agreed with Dr. Villalobos, in light of the history of a severe back

injury and pain that had not responded to anything short of narcotics.  While both Dr. Villalobos

and Dr. Lipshutz may be excellent physicians, the Court simply does not find their reports

persuasive in light of all the other evidence.

Finally, the Court is further persuaded by the findings of the SSA's Administrative Law

Judge (the "ALJ") with regard to Menard's social security benefits. (Doc. 33-8).  The ALJ noted

that, despite a statement by the State Doctor that Menard was capable of gainful employment,

Menard's testimony regarding his pain was compelling and credible. (Doc. 33-8 at 14-15).  As the

ALJ is in a much better position to assess Menard's credibility, his conclusion, while not

determinative, is persuasive.  Hartford did not hold any actual hearings on Menard's condition.

All of the evidence viewed by Hartford was presented on paper, which makes it almost impossible

to judge credibility. Essentially, Hartford chose to believe its own Doctor over Menard and his

Doctor.  Menard asserts that Dr. Villalobos spent only about fifteen minutes with him, and

Hartford has shown no evidence to refute this. (A.R. H-100-01).  It is undisputed that Dr. Lipshutz

never met Menard at all.  Under such circumstances, this Court will not credit the opinions of

Hartford's chosen physicians over the subjective complaints of the Plaintiff with regard to his own

pain, and the assessment of his chosen Physician.  Therefore, this Court disagrees with Hartford's

conclusions as to Menard's eligibility for benefits.

*B) Administrator's Discretion*

Having found that Hartford's decision was "*de novo* wrong," the Court must determine

whether Hartford had any discretion in making that eligibility decision.  A plan administrator is

said to have discretion only when "the plan *expressly* provides the administrator discretionary authority to make eligibility determinations or to construe the plan's terms." *Kirwan v. Marriott Corp.,* 10 F. 3d 784, 788 (11th Cir. 1994) (emphasis in original). In this plan, Hartford expressly reserves "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." (A.R. H-29). Therefore, the Court must give Hartford's determination some deference and apply the arbitrary and capricious standard.

> *C) Was Hartford's decision reasonable?*

In applying the arbitrary and capricious standard, the Court must decide whether Hartford's decision was reasonable. *See Williams,* 373 F.3d at 1138. As long as Hartford's decision was reasonable, it is entitled to deference even if Menard also advances a reasonable interpretation of the record, because the "underlying premise of arbitrary and capricious . . . review is that a court defers to the discretion afforded the claims administrator under the terms of the plan." *HCA Health Serv. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 994 (11th Cir. 2001). A decision will be considered arbitrary and capricious if the decision-maker "entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency . . ." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In this case, the Court cannot say that Hartford's decision was wholly unreasonable and therefore, must proceed to the next inquiry: whether there was a conflict of interest.

> *D) Conflict of Interest*

-13-

A conflict of interest is said to exist when the same entity is "responsible for paying claims as well as determining their validity." *Potter v. Liberty Life Assurance Co. of Boston,* 132 Fed. Appx. 253, 257 (11th Cir. 2005). In this case, Hartford clearly has a conflict of interest as it does both pay out claims and determine eligibility. Therefore, the Court must ultimately apply the heightened arbitrary and capricious standard in reviewing Hartford's decisions.

*E) Heightened Arbitrary & Capricious Review*

The Eleventh Circuit has described heightened arbitrary and capricious review as a level of deference "somewhere between the *de novo* and mere arbitrary and capricious standards." *Williams,* 373 F.3d at 1138. "Under the heightened arbitrary and capricious standard of review, the burden shifts to the claims administrator to prove that its interpretation of the plan is not tainted by self-interest." *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 994 (11th Cir. 2001). Therefore, the Court will overturn a wrong but reasonable decision by a plan administrator that "advances the conflicting interest of the administrator at the expense of the claimant." *Williams,* 373 F.3d at 1138. However, the administrator has the opportunity to defend its decision by offering evidence of a "routine practice" or "plausible justification" for the decision.[7] *Id.* The plan administrator will "bear the burden of dispelling the notion that its conflict of interest has tainted its judgment." *Brown v. Blue Cross & Blue Shield, Inc.*, 898 F.2d 1556, 1568 (11th Cir. 1990).

---

[7]"[A] wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries." *Brown v. Blue Cross & Blue Shield, Inc.*, 898 F.2d 1556, 1566-1567 (11th Cir. 1990).

In this case, it appears that Hartford's wrong but reasonable decision to deny Menard LTD benefits does advance its own interest at the expense of the claimant.  Every claim that Hartford pays out is money out of its own pocket, and therefore claim denials invariably advance Hartford's interests.  Therefore, the burden shifts to Hartford to defend its wrong, but reasonable, decision to terminate Menard's LTD benefits.

Hartford's motion does little, if anything, to meet this burden.  One reference is made to the fact that denying claims to participants who are not eligible to receive them benefits all participants (Doc. 30 at 20), however, this is a fairly obvious statement that this Court does not dispute.  Of course, Hartford is not required to pay benefits to anyone who is not eligible under the terms of the Plan.  The issue, instead, is whether or not Hartford is correctly determining eligibility.  In the case of Menard, the Court believes Hartford has failed.  There can be no legitimate argument that plan participants benefit when claims are *wrongfully* denied.

Hartford's effort to defend its decision relies on a defense of the way it made the decision.  Hartford argues that its decision to rely on the results of the IME and Dr. Lipshutz's review of Menard's medical records is a reasonable and routine practice in this context.  Hartford also argues that it is not required to award benefits merely based on the subjective complaints of a participant.  This Court does not disagree with either of those statements

However, Menard has a long medical history that contains both objective and subjective indications of disability.  This Court will not give deference to a self-interested decision that ignores all of the evidence in the record, be it subjective or objective, in favor of the opinions that are most beneficial to Hartford.  It is true that Menard's condition can range in severity and may

-15-

not always prevent a person from working.  However, the severity of the condition is illustrated by

the amount of pain a patient is in.  Hartford's argument suggests that Menard's own

characterizations of his pain should be disregarded.

In support of its reliance on the evaluations by Dr. Lipshutz and Dr. Villalobos, Hartford

points to *Hufford v. Harris Corp.,* 322 F. Supp.2d 11345 (M.D. Fla. 2004).  However, *Hufford*

indicates that plan administrators may require participants to submit objective evidence of

disability in cases where the medical condition can be easily deciphered through the use of

objective evidence. *Id.* at 1356-58.  That is not the issue presented here.  Neither side is alleging

that Hartford required Menard to present some type of objective evidence that he failed to supply.

Furthermore, the level of pain Menard is experiencing is not easily proved or disproved through

the use of objective means (such as laboratory).  Pain is necessarily diagnosed subjectively.

Merely because Dr. Lipshutz's review of Menard's records was done without listening to

Menard's complaints first hand, does not make his evaluation "objective" evidence that Menard is

not disabled.  Dr. Lipshutz's report is his own subjective evaluation of the records of other

Doctors.  The only objective evidence available in this case was submitted early on: an MRI on

November 1, 2002, and set of Lumbar Spine X-rays on September 9, 2003. (See e.g. A.R. H-170).

Both of these "objective" measures confirmed Menard's spinal injury.  Other than that, all of the

evidence is derived from Menard's complaints.  Apparently, Menard's physicians found his

complaints credible because of the injury he suffered, which has been objectively demonstrated.

There is no indication as to why Hartford's doctors disagreed.  Finally, *Hufford* is not analogous to

the situation here because it did not involve a conflict of interest such as the one presented here. *Id.*

at 1354.  When Hartford's self-interest is considered, as it must be, its total disregard of Menard's evidence is difficult to justify.

In essence, what we have here is a battle of the experts and a credibility issue.  Menard's complaints were found to be legitimate by his past treating physicians and Dr. Ortolani.  However, Dr. Villalobos apparently decided not to credit them.  As Hartford has offered no explanation to show that its wrong but reasonable decision about Menard's LTD benefits was not motivated by self-interest, the Court must hold that it fails the heightened arbitrary and capricious standard of review.

### IV. Conclusion

For the reasons stated herein, it is

**ORDERED** that Defendant's Motion for Summary Judgment (Doc. 30)  is **DENIED.**

**DONE** and **ORDERED** in Chambers, Orlando, Florida on October 30, 2006.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party